**EDINA COMMUNITY LUTHERAN CHURCH, Respondent,**

**Unity Church of St. Paul, Respondent,**

v.

**STATE of Minnesota, Appellant.**

**No. A07–131.**

Court of Appeals of Minnesota.

Feb. 5, 2008.

**198**

David L. Lillehaug, Frederikson & Byron, P.A., Minneapolis, MN, for respondent Edina Community Lutheran Church.

Marshall H. Tanick, Mansfield, Tanick & Cohen, P.A., Minneapolis, MN, for respondent Unity Church of St. Paul.

Lori Swanson, Attorney General, Peter Marker, Jocelyn F. Olson, Assistant Attorneys General, St. Paul, MN, for appellant.

Considered and decided by STONEBURNER, Presiding Judge; HALBROOKS, Judge; and MINGE, Judge.

## OPINION

MINGE, Judge.

Appellant State of Minnesota challenges the district court's grant of a permanent injunction barring enforcement of certain provisions of the 2005 Minnesota Citizens' Personal Protection Act (the 2005 Act) against respondent churches. Appellant contends that the district court erred by (a) concluding that the 2005 Act excessively burdens the rights of respondents protected by Minn. Const. art. I, § 16; (b) determining that the 2005 Act violates respondents' rights under U.S. Const. amend. I; and (c) finding that the 2005 Act violates the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc. Appellant also argues that the recognition of an exemption for the churches from statutory provisions generally applicable to private establishments violates the Establishment Clause of the federal constitution.

Because the district court did not err in granting injunctive relief based on the state constitutional provision guaranteeing religious liberty, and because the district court's recognition of an exemption does not constitute an impermissible establishment of religion, we affirm in part. Because this decision rests on independent and adequate state constitutional grounds, we do not reach the question of whether the district court erred in finding the 2005 Act unconstitutional under the First Amendment of the United States Constitution. Finally, because we conclude that the provisions of the 2005 Act pertaining to the exclusion of guns from private property do not constitute "land use regulations," we reverse that part of the district court's decision finding the 2005 Act to be in violation of RLUIPA.

## FACTS

In April 2003, the Minnesota Legislature adopted 2003 Minn. Laws ch. 28 (the 2003 Act). The legislation was immediately challenged in at least two separate actions: its enforcement was temporarily enjoined by one district court at the request of

religious organizations asserting violations of state and federal constitutional provisions, and it was declared by a different district court to violate the single-subject requirement of Minn. Const. art. IV, § 17. *See Unity Church of St. Paul v. State*, 694 N.W.2d 585, 590, 599 n. 2 (Minn. App.2005) (discussing different challenges to the 2003 Act), *review dismissed* (Minn. June 9, 2005).

On appeal from the judgment in favor of the challengers in the single-subject suit, this court affirmed the determination that articles 2 and 3 of the session law were unconstitutional because they were not germane to the same subject as article 1, which contained many provisions on topics relating to natural resources, but which were unrelated to handgun permitting and firearm regulation. *Id.* at 595. Although the district court had indicated its willingness to find the 2003 Act unconstitutional under Minnesota's Freedom–of–Conscience Clause, Minn. Const. art. I, § 16, this court declined to offer an advisory opinion on the alternative arguments raised by the challengers, leaving those issues for another day. *Id.* at 600.

This court's opinion was filed on April 12, 2005, and the state petitioned the supreme court for further review. *Id., pet. for rev. filed* (Minn. May 11, 2005). Shortly thereafter, the legislature reenacted the provisions of articles 2 and 3 "retroactively and without interruption from April 28, 2003" and added certain amendments in a session law that dealt exclusively with the permitting and regulation of firearms. 2005 Minn. Laws ch. 83, §§ 1–11 at 442–50 (the 2005 Act). The state then withdrew its petition for further review of this court's ruling concerning the 2003 Act.

The respondents on this appeal are Edina Community Lutheran Church (Edina) and Unity Church of St. Paul (Unity) (or collectively "churches"). Both were involved in a challenge to the 2003 Act, and both argued in that action that the act violated freedom-of-conscience and religious-association rights protected by the Minnesota and federal constitutions. As indicated above, those claims were not addressed on appeal because the act was declared unconstitutional on other grounds. *See Unity Church of St. Paul*, 694 N.W.2d at 600. After the legislature reenacted the Minnesota Citizens' Personal Protection Act in 2005, Edina and Unity brought the action now before us, seeking injunctive relief on grounds that were substantially similar to their earlier challenge.

Here, the district court granted permanent injunctive relief, prohibiting enforcement against the respondent churches of the statutory provisions relating to signage and personal notice, parking areas, and landlords. For ease of reference, we refer to the following provisions of the 2006 Minnesota Statutes as the "challenged provisions": Minn.Stat. § 624.714, subds. 17(a) and (b) (2006) (prescribing two options for notifying visitors that guns are banned from private establishments); 17(c) and 18(c) (barring private establishments and employers from prohibiting firearms in parking areas and facilities); and 17(e) (prohibiting landlords from restricting the possession of firearms by tenants or their guests).

The churches submitted the matter to the district court on the basis of a stipulated record, and the parties do not dispute the facts. That record contains uncontroverted affidavits from the churches describing the religious burden imposed by the challenged provisions. Edina provided affidavits from its bishop and pastors stating that compliance with the act would violate sincerely held religious beliefs and the church's statement of mission and purpose, which includes a commitment to peacemaking and nonviolence in all rela-

tionships. Edina's religious leaders assert that the church is considered to be a place of sanctuary. Regarding the requirement that signs be posted at every entrance, Edina's religious leaders explained that the entrances of Lutheran churches are reserved for important religious messages and this can be traced to Martin Luther's act of nailing the Ninety–Five Theses to the door of the Castle Church in Wittenberg, Germany.

Edina owns and operates a church building, contiguous parking areas, and a contiguous playground for children. The lower level of the church, which is used for Sunday school instruction and nursery school, is directly accessible from the parking lot. Edina provided specific evidence that its parking lot is used for worship activities, including the Vigil of Easter. As part of its religious mission, Edina asserts that it serves as employer of religious persons and landlord for a licensed child-care center that is operated in its church building. Finally, Edina provided evidence that its leadership and congregation unanimously seek to prohibit firearms on all of the church's property.

Unity also provided uncontroverted affidavits from its co-ministers. Unity's mission and values establish that the church strives to be a free and inclusive religious community that provides a place of sanctuary and is openly welcoming. On Sunday mornings, Unity has greeters at entrances to the church building to personally welcome visitors. Unity asserted that compliance with the signage and personal notice requirements of the act would be inconsistent with its mission to provide a safe sanctuary and welcoming place of worship. Unity's building—encompassing approximately 54,000 square feet—houses a large sanctuary and chapel, office space, classrooms, a nursery, gathering places and meeting rooms, a parish hall and kitchen, libraries, and a courtyard. Unity also considers two parking lots on church property important in accomplishing its religious mission. These lots, along with the church building, are used for weddings, funerals, religious education classes for youth and adults, prayer vigils, car washes and other fundraisers, and numerous community meetings and events.

Unity is also a landlord and an employer. At times, Unity's church premises serve as an overflow homeless shelter for Ramsey County's Project Home. Families arrive and leave by taxi through a church parking lot and, when needed, the church uses Sunday school classrooms as bedrooms. As part of Unity's commitment to peacemaking and nonviolence, church leaders have adopted resolutions prohibiting firearms on all church property. The resolutions reflect Unity's belief that the challenged provisions violate the right to use church property to communicate and exercise religious beliefs and burden the right to welcome worshippers and visitors as Unity sees fit.

The state does not challenge the sincerity of the religious beliefs asserted by the churches. The state presented affidavit evidence on the purposes underlying adoption of the 2003 Act and the 2005 Act, but did not present specific evidence on the impact, if any, of enjoining enforcement of the challenged provisions on church property.

## ISSUES

I. Did the district court err by concluding that the challenged provisions violate respondent churches' fundamental religious liberty rights protected by Minn. Const. art. I, § 16?

II. Did the district court err by finding that the challenged provisions violate freedom-of-association rights protected by the

First Amendment of the United States Constitution?

III. Does the district court's grant of a permanent injunction and recognition of a religious exemption violate the Establishment Clause?

IV. Did the district court err by finding that the challenged provisions violate RLUIPA?

## ANALYSIS

### I.

 We begin with the determination under the Minnesota Constitution. The constitutionality of a statute is a question of law to be decided de novo, and an appellate court is not bound by the district court's decision. *Hamilton v. Comm'r of Pub. Safety*, 600 N.W.2d 720, 722 (Minn. 1999). Statutes are presumed constitutional, and an appellate court should exercise extreme caution in deciding whether to declare a law to be unconstitutional. *Associated Builders & Contractors v. Ventura*, 610 N.W.2d 293, 298–99 (Minn.2000).

### A. Statutory Framework

A preliminary review of the specific provisions of the Minnesota Citizens' Personal Protection Act at issue may be helpful. Although the 2003 Act and the 2005 Act modified several statutes, most of the provisions that are the focus of this opinion are now codified in Minn.Stat. § 624.714 (2006) and were not significantly altered when reenacted in 2005. With the adoption of the 2003 Act, Minnesota became a "shall-issue" state, requiring county sher-

iffs to issue permits to carry firearms to qualified applicants. *Id.,* subds. 2(b) (defining those to whom permits must be issued), 6 (requiring sheriff to issue permit or deny on specified grounds within 30 days after receipt of application).

The manner and extent to which property owners, occupants, and operators of establishments may exclude firearms is treated differently in the applicable statutes, depending primarily on the type of property involved.[1] Limitations on the possession of firearms on school property are addressed principally in the criminal code. *See* Minn.Stat. § 609.66, subd. 1d (2006). With limited exceptions, people— including those who have permits to carry firearms—are not entitled to possess firearms on school property, including public and private elementary, middle, and secondary schools and their improved grounds; licensed child-care centers at which children are present and participating in child-care programs; or school buses. *Id.*

Other types of property are treated differently. The possession of firearms at private establishments is addressed in subdivisions 17 and 18 of section 624.714, and the parties to this appeal agree that these are the most pertinent provisions. Permit holders cannot be prohibited from carrying or possessing "firearms in a [private establishment's] parking facility or parking area." *Id.,* subd. 17(c). Beyond the parking areas, owners and operators of private establishments may request that those carrying guns leave their premises: "A person carrying a firearm ... under a permit or otherwise[2] who remains at a private

---

1. Some statutory provisions focus on the role of the person carrying the firearm, rather than the location. *See, e.g.,* Minn.Stat. §§ 609.66, subd. 1d(e)(1), (2) (2006) (peace officers and military personnel exempt from provisions criminalizing possession of dangerous weapons on school property), 624.714,

subd. 17(g) (2006) (exempting peace officers and security guards from provision providing for trespass for possession of a firearm on premises where they are banned).

2. The statute does not appear to be limited to those who are authorized to carry guns because they have lawfully obtained a carry

establishment knowing" of "a reasonable request" by the establishment's owner or operator that guns not be brought onto the premises "may be ordered to leave the premises." *Id.*, subd. 17(a). If someone who knows of a reasonable request to refrain from bringing guns onto the premises (a) fails to honor that request, (b) is ordered to leave, and (c) nonetheless fails to leave; the person may be found guilty of "a petty misdemeanor," but cannot be fined more than $25 for a first offense. *Id.; cf.* Minn.Stat. § 609.0331 (2006) (providing that maximum penalty for other petty misdemeanors is $300).[3] To qualify as a "reasonable request" to refrain from carrying guns onto the premises, the owner either (a) must post "a conspicuous sign at every entrance" stating that the operator of the establishment "BANS GUNS IN THESE PREMISES," and the placement of the sign must conform to detailed requirements as to typeface, color, size, lateral distance from the entrance, and height from the floor; or (b) must "personally inform[ ] the person that guns are prohibited in the premises" and must "demand[ ] compliance." *Id.*, subd. 17(b).

Respondents object to the provisions requiring churches to post signs or provide personal notice, to the requirement that they order a gun-carrying individual to leave the premises before the statutory sanction (a petty misdemeanor) may be invoked, and to the statutory prohibition against banning guns in church parking areas.

The statutory provisions on signage and personal notice contained in subdivision 17 have no application "to private residences." *Id.*, subd. 17(d). "The lawful possessor of a private residence may prohibit firearms, and provide notice thereof, in any lawful manner." *Id.* While the possessor of a private residence can exclude guns, "[a] landlord may not restrict the lawful carry or possession of firearms by tenants or their guests." *Id.*, subd. 17(e). In their role as landlords, the respondents object to the statutory prohibition against churches restricting the carrying and possession of guns by their tenants and the guests of their tenants.

In addition to the possessors of private residences, some other property owners are authorized to limit the carrying and possession of guns without complying with statutorily-mandated signage or personal notice requirements. Employers can limit the carrying of guns by employees who are acting within the scope of their employment, and postsecondary schools can restrict the possession of firearms by students on school property, but neither group can "prohibit the lawful carry or possession of firearms in a parking facility or parking area." *Id.*, subd. 18. Thus, although employers and postsecondary schools—like the owners and operators of private establishments—cannot ban guns from parking areas, they are free to adopt "policies" restricting the possession of guns on the job or on postsecondary school property and to impose "[e]mployment related civil sanctions" or "[a]cademic sanctions" for violations. *See id.*, subd. 18(a) (employment-related civil sanctions), (b) (academic sanctions). Neither the language of those policies nor the manner of imposing sanctions for violations is prescribed by the statute.

---

permit and are carrying a lawful weapon, because it refers to a person who is carrying a firearm "under a permit or otherwise." Minn.Stat. § 624.714, subd. 17(a).

**3.** In addition to the penalty for refusal to leave, a person carrying a gun without a permit may also be guilty of a gross misdemeanor under Minn.Stat. § 624.714, subd. 1a (2006) (unlawful possession).

## B. Constitutional Analysis

We turn now to appellant-state's challenge to the district court's determination that the challenged portions of the 2005 Act violate the churches' freedom-of-conscience rights under the Minnesota Constitution.

Article I, section 16 of the Minnesota Constitution states:

> The enumeration of rights in this constitution shall not deny or impair others retained by and inherent in the people. The right of every man to worship God according to the dictates of his own conscience shall never be *infringed* ... nor shall any control of or *interference* with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state[.]

(Emphasis added.)

■ "Religious liberty is a precious right." *State v. Hershberger,* 462 N.W.2d 393, 398 (Minn.1990). The people of this state have always cherished religious liberty and the high importance of protecting this right is demonstrated by its treatment in our constitution, where it appears even before any reference to the formation of a government. *State by Cooper v. French,* 460 N.W.2d 2, 8–9 (Minn.1990). The Minnesota Supreme Court has consistently held that article I, section 16 of the Minnesota Constitution affords greater protection against governmental action affecting religious liberties than the First Amend-

ment of the federal constitution. *Hill–Murray Fed'n of Teachers v. Hill–Murray High Sch.,* 487 N.W.2d 857, 864–65 (Minn. 1992); *Hershberger,* 462 N.W.2d at 397. "Whereas the first amendment establishes a limit on government action at the point of *prohibiting* the exercise of religion, section 16 precludes even an *infringement* on or an *interference* with religious freedom." *Hershberger,* 462 N.W.2d at 397. Thus, government action that is permissible under the federal constitution because it does not prohibit religious practices but merely infringes on or interferes with religious practices, may nonetheless violate the Minnesota Constitution. *Id.*

■ Minnesota courts employ a heightened "compelling state interest balancing test" when determining whether a challenged law infringes on or interferes with religious practices. *Hill–Murray,* 487 N.W.2d at 865. The test has four prongs: (1) whether the objector's beliefs are sincerely held; (2) whether the state regulation burdens the exercise of religious beliefs; (3) whether the state interest in the regulation is overriding or compelling; and (4) whether the state regulation uses the least restrictive means. *Id.*

### 1. The Sincerity of the Churches' Religious Beliefs

The state does not challenge the sincerity of the churches' religious beliefs. Both churches are committed to peacemaking and nonviolence, to maintaining and providing a place of sanctuary, and to using church property in furtherance of their religious missions.[4] Edina also submitted uncontroverted evidence that church en-

---

4. We note that nonviolence beliefs may be core principles in faith communities and that Congress has accommodated such religious-based beliefs in the vital areas of national defense and military conscription. *See* 50 U.S.C.App. § 456(j) (2000) (exempting from combatant training and service in the United States armed forces those who by reason of their "religious training and belief" are "conscientiously opposed to participation in war in any form.").

trances have a special significance in the Lutheran tradition. This prong of the test is clearly met.

### 2. Whether the Challenged Provisions Burden the Exercise of Religious Beliefs

The state argues that the challenged provisions of the 2005 Act present only a de minimis burden on the churches' exercise of their religious beliefs. The churches counter that the challenged provisions burden their rights to communicate and worship as they see fit, to use church-owned property to further their religious missions, to preclude employees from possessing firearms in parking areas, and to restrict the possession of firearms on church property by tenants.

 Under the second *Hill–Murray* factor, those challenging the application of a law have the burden of establishing that challenged provisions infringe on their religious autonomy or require conduct inconsistent with their religious beliefs. *Shagalow v. Minn. Dep't of Human Servs.*, 725 N.W.2d 380, 390–91 (Minn.App.2006), *review denied* (Minn. Feb. 28, 2007). To constitute such a burden, the challengers must establish that the risk of interference with religious beliefs or practice is real and not "remote." *Hill–Murray*, 487 N.W.2d at 866. Religious institutions can be required to comply with statutes of general application, and the focus is on whether compliance requires a change in "religious conduct or philosophy." *Rooney v. Rooney*, 669 N.W.2d 362, 369 (Minn.App.2003), *review denied* (Minn. Nov. 25, 2003).

### (a) Church Building; "Reasonable Request" Alternatives

 Under the statute, two options are prescribed for private establishments that wish to communicate their preference that visitors refrain from carrying guns. They must either (a) post "a conspicuous sign at every entrance" that states the operator of the premises "BANS GUNS IN THESE PREMISES," and each sign must conform to specific statutory requirements on typeface, size, color, and placement, or (b) personally inform "the person that guns are prohibited in the premises and demand[ ] compliance." Minn.Stat. § 624.714, subd. 17(b)(1)(i)-(ii) (2006). Even after making a "reasonable request" that guns not be brought onto the premises, and even if that request complies precisely with the terms of the statute, the owner or operator of a private establishment must also order a person who refuses to comply "to leave the premises," before that person can be prosecuted for petty misdemeanor trespass. Minn.Stat. § 624.714, subd. 17(a). In addition, the gun possessed by the trespasser is not subject to forfeiture. *Id.; cf.* Minn.Stat. § 609.531, subds. 1(b), 4 (2006) (weapons subject to forfeiture).

### (i) The Sign Provision

The state contends that the first option—posting signs at every entrance to the church premises—constitutes only a de minimis burden and does not force the churches to change their religious conduct or philosophy. The state presented no evidence to the district court to establish that the use of signs at every entrance would have no impact on protected religious beliefs. Instead, the state argues that the sign provision is religiously neutral and presents no greater burden than public welfare laws, such as those requiring exit signs and the allowance of seeing-eye dogs.

But the uncontroverted affidavits before us establish that the sign provision does compel churches that wish to exclude firearms to act in a manner that is inconsistent with their religious beliefs by requiring that they place specific, conspicuous

signs at every entrance to the church. The churches' affidavits also establish that they adhere to a philosophy of welcoming visitors to a place of sanctuary and that compelling the use of specific prohibitory language is inconsistent with their religious beliefs.[5] None of the evidence shows that exit signs or signage related to persons with disabilities requires any change in the churches' religious conduct or philosophy, is inconsistent with any religious belief, or would be immediately apparent to all entering the churches' front doors in the same manner as the signs at issue. The analogy is not persuasive.

The state also argues that the churches' use of alternative signs demonstrates that the statutory provision does not substantially burden the exercise of religious beliefs. The record discloses that Edina posted a sign that reads: "Blessed are the peacemakers. Firearms are prohibited in this place of sanctuary." The state argues that the churches could easily comply with the law by inserting "Edina Community Lutheran Church bans guns in these premises" between the first and second sentences of the existing sign. However, the statute requires very specific language; even the alternative proposed by the state appears to violate the sign provision. *See* Minn.Stat. § 624.714, subd. 17(b)(1)-(3) (mandating the use of specified language and typeface and establishing requirements as to color, size, and placement of sign), (f) (providing that this statute "sets forth the exclusive criteria" for notifying permit holders that "otherwise lawful firearm possession is not allowed in a private establishment").

The Minnesota Supreme Court has recognized that the compelled use of a specific warning, whose color and meaning are mandated by the state, may sometimes be "antithetical to" sincerely held principles of religious faith. *Hershberger*, 462 N.W.2d at 396. The fact that religious adherents are willing to convey a warning or message on the same subject, using different methods or means of communication, did not preclude the supreme court in *Hershberger* from finding that the state-mandated slow moving vehicle symbol at issue substantially burdened religious freedom. *Id.* (declining to reconsider court determination that sincere religious beliefs of the Amish precluded use of state-mandated symbol and court rejection of a proposed less-restrictive alternative based on use of "reflective tape with lighted red lanterns"). Similarly, the willingness of respondents to convey their views about the possession of guns on church property through alternative methods does not render the compelled notice provisions a minimal burden on sincerely held religious beliefs.

### (ii) *The Personal Notification Provision*

If a church elects not to post signs that comply with the statute at every entrance, it may satisfy the statutory requirement of making a "reasonable request" to refrain from bringing guns onto the premises by "personally inform[ing] the person that guns are prohibited in the premises and demand[ing] compliance." Minn.Stat. § 624.714, subd. 17(b)(1)(ii). Given the number of entrances to church buildings, stationing representatives of the church at every door to speak with every visitor about the gun ban may well be unrealistic or, at the very least, a burden on the churches.

The state asserts that the statute does not require individual oral notice and proposes that churches call their members, send letters and e-mails, or place notices in

---

5. As previously stated, appellant does not challenge the sincerity of the churches' beliefs in nonviolence. We note that not all churches may share those beliefs.

the church bulletin. The state's proposed alternatives to face-to-face contact are troublesome. At the outset, it is not clear that the state's proposed alternatives are consistent with the statute. The statute requires that the churches' "agent personally inform[ ]" others. *Id.* Mailed or published notice is not recognized as an alternative. Phone calls, letters, and e-mails would reach only regular members or attendees who have chosen to provide contact information, and will not provide the statutorily required personal notice to first-time or casual visitors.[6] To ensure effective notice, church staff, members, or volunteers would still have to monitor every church entrance and identify all visitors, verifying that they have previously received notice or personally informing them of the churches' policy on guns. This would be inconsistent with the churches' stated mission of providing a welcoming and open place of sanctuary and worship.

The state also suggests that churches announce their gun policies prior to or at the beginning of services, asserting that this would not constitute a significant burden because other announcements are often made at that time regarding the birthdays of members and upcoming community events. Such an announcement may not reach those who arrive late to services, parents tending to fractious children or assisting with Sunday school, and those who are inattentive. Even assuming that a general announcement would satisfy the statutory requirement that "the person" having a gun be personally

informed of the policy, the suggestion that religious leaders incorporate a state-mandated message about gun possession into every worship service is constitutionally troublesome because the record establishes that the message is inconsistent with the churches' religious philosophy.

We agree with the district court that the record establishes that the personal notice provision significantly burdens the sincerely held religious beliefs of the respondent churches. We need not determine whether all religious organizations would be similarly burdened by enforcement of the statutes or whether requiring personal notice could be permissible on church property not used for worship or religious purposes.

(b) *The Parking Area Provisions*

■ The 2005 Act provides that "[t]he owner or operator of a private establishment may not prohibit the lawful carry or possession of firearms in a parking facility or parking area." Minn.Stat. § 624.714, subd. 17(c). Similarly, while churches, as employers, can establish policies restricting the possession of firearms by employees acting in the course and scope of employment, employers cannot prohibit the carrying or possession of guns by employees in privately owned parking lots or facilities. *Id.*, subd. 18(a), (c).

Evidence submitted by the churches established that parking areas on church property serve an important role in their religious missions. The parking areas of

6. The state asserts that Utah is similar to Minnesota in not having a statutory ban on the possession of guns on church property. But Utah specifically allows churches and places of worship considerable flexibility in communicating their preferences regarding the possession of guns on church property. Churches may give personal notice, post signs that are "reasonably likely to come to the attention" of those entering, make an an-

nouncement during services, publish notice in a bulletin or newsletter, or publish a notice "in a newspaper of general circulation in the county in which the house of worship is located or ... has its principal office...." Utah Code. Ann. § 76–10–530(2) (West 2007). In fact, Utah affords the same flexibility regarding the provisions of notice to both churches and those in lawful possession of private residences. *Id.*

respondent churches are adjacent to their places of worship and are used for worship services, weddings and funerals, religious education classes, prayer vigils, fundraising, and other church-approved events. There was no evidence that the respondent churches charge parking fees or operate these parking areas as commercial ventures. The state argues that the statutory requirement that permit holders be allowed to store guns in their vehicles while on church property does not require the churches to change their religious conduct or philosophy. The state proposes a "functional test" that would allow churches to ban guns from parking areas during worship services, but not when these areas are used solely for parking.

The state's effort to reconcile both state and religious interests is not consistent with the language of the statute. The statute prohibits the churches from banning guns in its parking areas, without regard to the nature of the activities being conducted there—even if those activities include worship services. Minn.Stat. § 624.714, subds. 17(c), 18(c). Furthermore, the proposed test would create an additional burden for churches (and, potentially, for the courts), because it would require that the purpose of each function be examined to determine its connection to the churches' religious missions, and whether guns could be temporarily banned from parking areas. State monitoring of the use of church property creates a substantial risk of interference with religious activities and philosophy. Existing case-law does not support placing the state in the position of second-guessing a church's determination that, for example, a car wash held by a youth group to raise funds for mission work is sufficiently connected

with the church's religious mission to justify a temporary gun ban in the church parking lot.

The district court expressed its concern that the statutory provisions limiting a property owner's control over privately-owned parking areas significantly alters and diminishes the rights of property owners. Although one of the fundamental elements of property rights is the right to exclude others and the government's power to take that right without compensation is limited, *see Kaiser Aetna v. United States*, 444 U.S. 164, 179–80, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979), we do not base our decision on concepts related to property ownership. And we need not consider whether the statutory limits on banning guns in parking areas would similarly burden religious freedom if applied to commercial parking facilities owned by churches or parking areas wholly unrelated to religious activities.[7]

### (c) *The Tenant Provision*

■ The state challenges the district court's conclusion that barring a landlord's ability to "restrict the lawful carry or possession of firearms by tenants or their guests" is unconstitutional as applied to tenant-used portions of church premises. Minn.Stat. § 624.714, subd. 17(e).

We presume that the restriction is intended to protect tenants and guests who have complied with the statutory provisions for obtaining permits to carry firearms and who are conducting themselves lawfully. The sincerely held religious beliefs of a landlord sometimes require an exemption from laws designed to protect the rights of tenants and potential tenants,

---

7. *See United States v. Lee*, 455 U.S. 252, 261, 102 S.Ct. 1051, 1057, 71 L.Ed.2d 127 (1982) (stating that "followers of a particular sect" may sometimes be subject to "statutory schemes which are binding on others" when they "enter into commercial activity as a matter of choice," notwithstanding the limits of their own conscience and faith).

especially if those affected are not members of constitutionally recognized classes. *See State by Cooper*, 460 N.W.2d at 10–11 (holding that landlord whose sincere religious beliefs were inconsistent with premarital cohabitation was entitled to exemption from state's enforcement of human rights act prohibiting discrimination based on marital status). The record establishes that the respondent churches serve as landlords for licensed child care, homeless services, and various community organizations and programs operating on church property. The inability to control whether tenants or their guests possess guns on church property burdens the religious conduct of the churches because they are denied the opportunity to limit the use of the actual church premises to tenants whose operations are consistent with the churches' commitment to nonviolence and their opposition to the carrying of guns. These are the same facilities where religious services are conducted. Thus, we conclude that the challenged provisions relating to landlords significantly burden the churches' sincerely held religious beliefs and their right to religious freedom under the Minnesota Constitution.[8]

### 3. *Whether the State Interests Promoted by the Challenged Provisions are Overriding and Compelling*

Because respondent churches have established that the challenged provisions significantly burden their exercise of religious beliefs, the burden now shifts to the state to demonstrate the existence of compelling and overriding governmental inter-

ests that may, under some circumstances, outweigh the important interest in preserving religious liberty. *See Hill–Murray*, 487 N.W.2d at 866. The state contends that recognizing an exemption for the churches will affect the state's interest in (a) regulating the fundamental, individual right to keep and bear arms; (b) increasing public safety by allowing citizens to protect themselves against violent crimes; (c) protecting the fundamental right to travel; and (d) ensuring clarity and uniformity in notices about the banning of guns.

Under article I, section 16, "[o]nly the government's interest in peace or safety or against acts of licentiousness will excuse an imposition on religious freedom under the Minnesota Constitution." *Hershberger*, 462 N.W.2d at 397. Even when public safety is at stake, the "blanket denial of a religious exemption" is not appropriate unless the government can establish that the affected religious practices are specifically *"inconsistent* with public safety." *Id.* at 398. In *Hershberger*, the court specifically rejected the state's assertion that public safety required the uniform use of a state-designated symbol to warn other drivers about slow-moving Amish buggies, concluding that the competing values of freedom of conscience and public safety could be achieved, despite the recognition of an exemption based on religious beliefs. *Id.* at 399.

The legislature has declared that the statute furthers a compelling state interest in regulating the "fundamental, individual right to keep and bear arms."[9] Minn.

---

**8.** The churches did not file a notice of review, so we do not address the district court's determination that off-site property owned by churches and used for commercial purposes unrelated to religious missions would not fall within the exemption.

**9.** The 2003 and 2005 Acts declare that they are necessary to regulating the rights of individuals to keep and bear arms as guaranteed by the Second Amendment of the United States Constitution. Minn.Stat. § 624.714, subd. 22 (2006). The state has not argued that the permanent injunction affects any Second Amendment rights. We are aware of the

Stat. § 624.714, subd. 22 (2006). More specifically, the state contends that the purpose of the law is to protect citizens by allowing them to carry firearms to deter and defend against violent behavior. But the state presented no evidence in the district court that denying an exemption to religious institutions would result in the victimization of citizens at church functions, in church parking lots, or in church building areas used by tenants. The state therefore did not show that religious practices, including the religious-based exclusion of weapons from church property and activities, are actually *"inconsistent* with public safety" as the standard articulated in *Hershberger* demands. *See Hershberger*, 462 N.W.2d at 398. Some might argue that because conflicts over religious differences have occasionally led to volatility and violence, guns should be banned on church property. Others might argue that churchgoers are less likely to be targeted by those who disagree with their views if there is at least the possibility that congregants are armed. We need not decide which view is more persuasive, because the record before us simply does not include any evidence that permitting these respondents to ban guns on church property is inconsistent with the articulated state interest in public safety. Accordingly, we conclude that the state's interest in public safety does not outweigh the churches' right to freely exercise their religious beliefs.

The state also asserts that exempting churches from the law will burden the fundamental right to travel, claiming that the right to possess a firearm in a parking lot is crucial to travel. But the record establishes that on-street parking is available near both churches, and there was no evidence establishing that those wishing to visit the churches would have no alternative to the church parking lots. We note that the state's argument is also inconsistent with the statutory exemption for the lawful possessors of private residences, who are free to prohibit firearms and provide notice of their preference to visitors "in any lawful manner." Minn.Stat. § 624.714, subd. 17(d). If the fundamental right to travel is not violated by that exemption, it is unlikely to be violated by recognizing an exemption for church property.

Finally, the state asserts that the statute promotes a compelling interest in ensuring clarity and uniformity in the communication of messages about where guns are prohibited. A comparable argument concerning the use of uniform warning symbols was rejected in *Hershberger*, 462 N.W.2d at 399, and the argument is further undercut by the fact that uniformity is not required when lawful possessors of private residences communicate their preference that guns be excluded, when employers communicate their policies regarding the carrying of firearms by employees while acting in the scope of their employment, or when public postsecondary institutions communicate their policies about the carrying of firearms by students on school property. *See* Minn.Stat. § 624.714, subds. 17(d), 18. As a result, we conclude that the state failed to demonstrate that any compelling and overriding governmental interest promoted by the

controversy regarding the proper interpretation of the Second Amendment and the pendency of an appeal on the extent to which the amendment guarantees individual rights before the United States Supreme Court. *Parker v. D.C.*, 478 F.3d 370 (D.C.Cir.2007), *pet. for cert. granted*, —— U.S. ——, 128 S.Ct. 645, 169 L.Ed.2d 417 (2007) (No. 07–290). We need not address that issue and we do not anticipate that a decision by the Supreme Court will affect our consideration of the state's challenge to the injunction granted in this case.

challenged provisions is significantly affected by recognizing an exemption for the churches.

### 4. Whether the 2005 Act Uses the Least Restrictive Means to Achieve the State Interests

The final *Hill–Murray* factor considers whether the statute uses the least restrictive means to achieve the state interests. The district court agreed with the churches that a religious exemption is the least restrictive means to accomplish the goals of the 2005 Act without burdening freedom-of-conscience rights.

The state presented no evidence that the churches' communication, in whatever manner and language they deem appropriate, of the policies they have adopted against the carrying and possession of guns would not be an effective way of accommodating the competing public interests and religious liberty. The record indicates that more than 30% of the states with "right-to-carry" laws have recognized exemptions for religious institutions. Respondent churches have identified other possible means of achieving the state's interest in protecting those who are not armed, including increased police patrols. But because the state in this case, as in *Hershberger*, "failed to provide a record which demonstrates that both" the constitutional value of freedom of conscience and the interests intended to be promoted by the statute "cannot be achieved through" the exemption sought by the challengers on religious grounds, we conclude that the state failed to establish that the challenged provisions constitute the least restrictive alternative. *See Hershberger*, 462 N.W.2d at 399.

### II.

The second issue is whether the 2005 Act violates the churches' right to freedom of association under the First and Fourteenth Amendments to the United States Constitution.[10] The district court concluded that the 2005 Act forces churches to associate with people who wish to carry firearms on religious property by prohibiting churches from banning the possession of firearms in parking facilities and leased spaces.

■■■ "It is axiomatic that a state court may interpret its own state constitution to offer greater protection of individual rights than does the federal constitution." *State v. Fuller*, 374 N.W.2d 722, 726 (Minn. 1985); *see also Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975). "State courts are, and should be, the first line of defense for individual liberties within the federalist system." *Fuller*, 374 N.W.2d at 726. Both *Hill–Murray* and *Hershberger* were based on the interpretation of the Minnesota Constitution provisions guaranteeing religious liberty, rather than the First Amendment of the United States Constitution. *Hill–Murray*, 487 N.W.2d at 864; *Hershberger*, 462 N.W.2d at 397. Because our affirmance of the exemption recognized by the district court is based on independent and adequate state grounds, we find it unnecessary to address the district court's grant of injunctive relief on federal constitutional grounds.

### III.

■■■ The state argues that the district court's permanent injunction confers a special benefit on religious institutions and constitutes an establishment of religion in violation of article I, section 16, of

---

**10.** *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), ap-

plies the First Amendment to the states by virtue of the Fourteenth Amendment.

the Minnesota Constitution and the First and Fourteenth Amendments to the United States Constitution. Establishment and free-exercise claims are sometimes related, but when a law of general application is alleged to burden the rights of a religious institution, the issues "are most appropriately analyzed under the free exercise clause" and a claim that is framed in terms of the Establishment Clause may "actually [be] a free exercise question." *Hill–Murray,* 487 N.W.2d at 863. Nonetheless, we will address the state's argument.

■ No law shall be made respecting an establishment of religion, U.S. Const. amend. I, and no preference may be given by law to any religion or form of worship, Minn. Const. art. I, § 16. Exempting churches and church property from state laws that are otherwise generally applicable does not give rise to a violation of the Establishment Clause so long as no one religion is "favored over others and none suffer[ ] interference." *State v. Am. Fundamentalist Church (In re Collection of Delinquent Real Prop. Taxes),* 530 N.W.2d 200, 205 (Minn.1995) (quoting *Walz v. Tax Comm'n,* 397 U.S. 664, 677, 90 S.Ct. 1409, 1415, 25 L.Ed.2d 697 (1970)) (holding that tax exemption for church property does not violate Establishment Clause). The state has not identified any Minnesota case finding an Establishment Clause violation in analogous circumstances where an injunction has been granted to prevent enforcement of a state statute against particular plaintiffs.

■ If we assume that the injunction is analogous to a state-imposed mandate, we apply *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), to determine whether it violates the Establishment Clause. *See In re Rothenberg,* 676 N.W.2d 283, 292 (Minn.2004) (applying the *Lemon* standard to evaluate a claim that supreme court rules requiring lawyers to take classes directed at the elimination of bias violated the Establishment Clause). To survive this challenge, the exemption and injunction must (1) have a secular purpose; (2) neither advance nor inhibit religion as their primary effect; and (3) not foster excessive governmental entanglement with religion. *Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111. "When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." *McCreary County, Ky. v. ACLU of Ky.,* 545 U.S. 844, 860, 125 S.Ct. 2722, 2733, 162 L.Ed.2d 729 (2005).

The state has not established that the district court was motivated by a desire to *advance* the religious beliefs of respondents. Controlling caselaw required the district court to examine the impact of the challenged provisions on sincerely held religious beliefs, which it did, and to balance the constitutional rights of the respondents with the articulated state interests promoted by the challenged provisions. *See Hershberger,* 462 N.W.2d at 399 (requiring "balancing" of "competing interest[s]"). The determination that respondents are entitled to an exemption that is analogous to the exemption already afforded to possessors of private residences places them on equal footing; it does not improperly favor or advance religion.[11] The exemption also avoids government entanglement

---

11. As previously noted, possessors of private residences are free to ban guns on their property, including parking areas, and to communicate their preferences "in any lawful manner." Minn.Stat. § 624.714, subd. 17(c). The district court's injunction extends to appellant's similar protections.

with religion because the government need not monitor church policies on the carrying of weapons, the methods by which churches communicate with members and visitors on the topic, or the degree to which particular church activities are essentially "religious."

Because the district court's limited grant of injunctive relief properly balanced the state's interest in general enforcement of the law with protecting religious freedoms guaranteed by article I, section 16, we conclude that this relief does not impermissibly favor religious institutions or constitute an improper establishment of religion.

## IV.

■■■ The final issue is whether the 2005 Act, as applied to churches, violates the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc.

RLUIPA prohibits governmental entities from imposing or implementing a "land use regulation" that "treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution" or that "unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. §§ 2000cc(b)(1), (3)(B).

The term "land use regulation" means a zoning or landmarking law,[12] or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

42 U.S.C. § 2000cc–5(5). Congress provided for a broad construction of RLUIPA, stating that the law "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc–3(g).

■■■ The threshold question is whether the 2005 Act qualifies as a zoning or landmarking law under the statute. A zoning law is one that regulates building development and use of property. *Mendota Golf, LLP v. City of Mendota Heights,* 708 N.W.2d 162, 172 (Minn.2006); *Advantage Capital Mgmt. v. City of Northfield,* 664 N.W.2d 421, 426 (Minn.App.2003). A statute that imposes land-use restrictions that run with the land may also be considered a zoning law. *Orme v. Atlas Gas & Oil Co.,* 217 Minn. 27, 32–33, 13 N.W.2d 757, 761 (1944). Black's Law Dictionary describes "zoning" as "[t]he legislative division of a region ... into separate districts with different regulations within the district for land use, building size, and the like." *Black's Law Dictionary* 1649 (8th ed.2004). The 2005 Act does not impose land-use restrictions or regulate the development of church-owned property, and it does not single out religious institutions or activities.

The legislative history of RLUIPA is instructive in determining the scope of what Congress intended to include as a "zoning law." Congress enacted RLUIPA in order to address a widespread pattern of religious discrimination in land-use regulation. 146 Cong. Rec. 6687–90 (Jul. 13, 2000); *see also* Roman P. Storzer & An-

---

12. "Landmarking laws generally involve the 'regulat[ion] and restrict[ion of] certain areas as national historic landmarks, special historic sites, places and buildings for the purpose of conservation, protection, enhancement and perpetuation of these places of natural heritage.'" *Albanian Associated Fund v. Twp. of Wayne,* No.06-CV-3217(PGS), 2007 WL 2904194, at *7 (D.N.J.Oct. 1, 2007).

thony R. Picarello, Jr., *The Religious Land Use and Institutionalized Persons Act of 2000: A Constitutional Response to Unconstitutional Zoning Practices,* 9 Geo. Mason L.Rev. 929, 945–46 (Summer 2001). Evidence was presented to Congress of land-use regulations that particularly affect religious institutions, including laws prohibiting the construction of places of worship, an ordinance requiring religious institutions (only) to obtain a $1,000 permit before supplying food to the homeless, a city's permitting process that resulted in the refusal to allow Jewish prayer meetings but not school meetings and book clubs, locally imposed limitations on permissible operational hours, and a city directive limiting occupancy of a church to 70 people, even though the building seated 500 people. 146 Cong. Rec. S7774, S6689–90 (Jul. 13, 2000).

The challenged provisions of the 2005 Act interfere with some of the traditional rights of property owners to exclude others, but the act does not regulate the development or use of church property in any way that is analogous to zoning laws. The churches are still free to use and develop their property for all purposes authorized under existing zoning and land-use regulations. They are not being required to alter—or being restrained from altering—the structural or architectural design of any building. The churches clearly oppose the challenged provisions, but there is no analogy to the hurdles imposed by requiring that additional permits be obtained from the government, prohibiting religious services and gatherings, or limiting attendance at church functions.

We conclude that the challenged provisions are not properly characterized as "land use regulations," within the meaning of RLUIPA, and we therefore reverse the grant of injunctive relief to the extent that it is based on RLUIPA.

## DECISION

Because we conclude that the district court did not err in finding that certain provisions of the 2005 Act violated the churches' freedom-of-conscience rights, we affirm the district court's grant of a permanent injunction on state constitutional grounds as applied to the churches' property, including related parking areas used for religious activities. We reverse the grant of injunctive relief to the extent it is based on RLUIPA because the 2005 Act may not properly be characterized as a zoning law.

**Affirmed in part and reversed in part.**